The STATE OF DELAWARE v. The President, Directors and Company of the BANK OF SMYRNA.

It is no longer an open question, but well settled, that the legislature can bind the State by contract with a corporation chartered by it, not to tax for a given time, the franchise, or property of such corporation further than is agreed on in the charter. Such a charter is a contract between the State and the corporators, which is protected by the constitution of the United States, and is inviolable ; and an agreement to limit, or restrain the power of the State to impose further taxes on the franchise of a corporation during the continuance of its charter, may enter into such a contract and have binding force.

Such a contract for exemption from taxation, however, will not be implied ; though it will be enforced when clearly expressed.

The property of banking corporations is, the franchise, or right to do banking business within the limits of their charter ; their capital invested in such business, their surplus earnings set apart undivided, and such other property, real and personal, as they may be authorized to have. All of which is liable to taxation like the property of individuals, unless it is otherwise agreed upon in their charter.

The *bonus* to the State is the price paid for the franchise, or power to do banking business. Whether measured by tax on capital stock, or by a specific sum stipulated, it is the price paid for doing business as a bank ;

and unless otherwise stipulated and agreed upon, it does not exempt other property, such as the surplus accumulation of earnings derived from that business while in its hands undivided from taxation, no more than it exempts from taxation the dividends in the hands of the stock holders, or the banking house, or any other real property held by it.

By the original act of incorporation of the bank of Smyrna, the legislature provided that as a condition of passing the act, the company should pay the State semi-annually at the rate of one half of one per centum per annum, on the stock actually paid in, during the continuance of the charter ; but before the bank was organized and went into operation under the act, the section containing this provision was repealed by a supplement at the ensuing session of the legislature which enacted " that in lieu of other taxes, " the bank should pay a tax semi-annually at the rate of one fourth of one per cent on the whole of the capital stock actually paid in, during the continuance of the charter ; and by a still latter act, a tax of one fourth of one per cent was imposed on seventy five per cent. of the surplus or contingent fund of the banks of the State generally. *Held* that the words " in lieu of other taxes " contained in the supplement to the charter, did not exempt the bank from the pay- ment of the last mentioned tax imposed on its surplus, or contingent fund by the general act of the legislature ; nor would it warrant the inference that the State thereby agreed not to impose any tax thereafter, on this, or any other property of the bank. The general act imposing the tax on the surplus or contingent fund of the banks of the State, so far as it related to the bank in question, was therefore constitutional, and the bank was bound to pay it.

When exemption from taxation exists, it lasts only during the continuance of the charter, and unless expressed when the charter is renewed and extended, the power to tax will revive.

THIS was an amicable action in the Court of Errors and Appeals authorized by a resolution of the Legislature " in relation to the Bank of Smyrna," adopted February 25, 1857, to adjudicate the question of the constitutional validity of an act of the Legislature entitled " An Act to tax the surplus, or contingent fund of the Banks of the State of Delaware, " passed February 24, 1855, so far as it concerned the Bank of Smyrna, on the following facts stated.

The defendants are a corporation originally created by an act of the General Assembly of this State, entitled " An Act to establish a Bank and to incorporate a Com- pany under the name of the Bank of Smyrna," passed at Dover, February 5th, 1821 ; in and by which Act, in

the 20th Section thereof, it was provided in the words following, viz :

" *And be it further enacted,* That as a condition of the " passing of this Act, the President, Directors and Com-" pany of the Bank of Smyrna shall, semi-annually, pay " to the Treasurer of the State, for the use of the State, " at the rate of one-half of one per centum per annum " on the stock actually paid in for and during the contin-" uance of the present charter."   And by the 23d Section of said Act, it was provided as follows, viz : " That it is " upon the condition contained in the 20th Section, and " upon the other conditions in this Act mentioned, that " this charter of incorporation is granted, and in case the " same and every part thereof should not be complied " with by the President, Directors and Company of the " said Bank, according to the true intent and meaning " thereof, then the authority hereby given shall cease and " be of no effect."

By a subsequent Act of the General Assembly, entitled " A supplement to the Act entitled An Act to establish a Bank and incorporate a Company under the name of the Bank of Smyrna," passed at Dover, February 7th, 1822, the aforesaid corporation was continued until the 1st day of September, A. D. 1843; and by the same Supplementary Act, in the 6th Section thereof, it was provided in the words following, to wit :

" That the 20th Section of the Act to which this is a " Supplement, and so much of the 23d Section as relates " thereto be and the same hereby are repealed, and that " in lieu of other taxes the said President, Directors and " Company of the Bank of Smyrna shall pay the Treas-" urer of this State for the use of the State, a tax semi-" annually at the rate of one-fourth of one per centum " on the whole capital stock of the said Bank actually " paid in, for and during the continuance of the said " Bank from and after the first day of September next.

By two Acts of the General Assembly passed in the year 1837, on the 17th and 21st days of February, the former entitled,"A Further additional Supplement to the Act entitled An Act to establish a Bank and incorporate a Company under the name of the Bank of Smyrna;" and the latter entitled "An Act Supplementary to the charters of certain Banks therein mentioned," the original Act of incorporation and the Supplement thereto of 7th February, 1822, were extended until the 16th day of February, A. D. 1857, and it was provided that "the corporation and body politic created, established, or continued by the said recited Acts, or any of them, with all the rights, powers, privileges, franchises and immunities which were then vested in the said corporation by any law of this State should be thereby continued, extended, and held in full force and operation until the said 16th day of February, A. D. 1857."

By an Act of the General Assembly, entitled "An Act for the renewal of the charter of the Bank of Smyrna," passed at Dover, February 13th, 1855, the aforesaid corporation was renewed and continued for and unto the end and term of twenty years from the day of passing said last mentioned Act inclusive; and the capacity of the said corporation and body politic, and all the powers, privileges and franchises belonging to, or vested in the same by any Act of the General Assembly of this State were, by the said Act, re-enacted and extended for the said term; and by the same Act it was provided that the tax to be thereafter paid by the said Bank should be one-half instead of one-quarter of one per cent. per annum; *provided*, that no tax should be required on any stock held for the benefit of the school fund.

By an Act of the General Assembly entitled, "An Act to tax the surplus, or contingent fund of the Banks in the State of Delaware," passed at Dover, February 24th 1855, it was provided in the words following, to wit:

" That each of the Banks that now are, or may hereafter
" be chartered in this State shall pay to the State Treas-
" urer semi-annually hereafter on the first day of July
" and January a tax of one fourth of one per centum per
" annum upon all and every portion of the surplus, or
" contingent fund of the said Banks exceeding twenty-
" five per cent. of the said surplus, or contingent fund."

The President, Directors and Company of the Bank of
Smyrna were duly organized as a Banking Institution
under and pursuant to the original Act of Incorporation
and the Supplement thereto of 7th February, A. D. 1822,
and· subsequently to the passage of said Supplement;
and the said corporation has continued until the present
time as an organized Banking Institution and transacting
business as such, under and in pursuance of the said
original Act of Incorporation and the said Supplement
thereto, and the several acts renewing and extending the
same above set forth. That the said corporation has
hitherto fully paid to the State the tax imposed upon it
in respect to its capital stock by the acts above recited as
the same became due and payable.

All the several acts of the General Assembly above
referred to and in part recited, as well as any and all
other acts of the General Assembly the provisions of
which may touch, or concern the said corporation, or its
rights, privileges, immunities, franchises, or liabilities,
are hereby expressly made a part of this case stated, and
submitted to the consideration of the Court in forming
their opinion upon the question hereinafter presented for
its judgment.

Since the passage of the Act of February 24th, 1855,
for taxing the surplus or contingent Fund of the Banks
of this State, the President, Directors and Company of
the Bank of Smyrna, have, upon the demand of the
Treasurer of this State for the time being, paid to him
in the whole the sum of one hundred and eighty-four
dollars and ninety-two cents, that being the amount

claimed by the said Treasurer to be due to the State under the act last aforesaid as a tax upon the taxable portion of the surplus, or contingent Fund of said Bank up to the 1st day of January, A. D. 1857. Such payment was made under a protest on the part of the said Bank, by which it was insisted that the Bank was under no legal liability for the payment of such tax, and the privilege was reserved of appealing to the proper authority for the decision of the question of its liability.

It is hereby agreed that if, upon consideration of the premises hereinbefore recited and referred to, the Court should be of opinion that the defendants are, by virtue of the aforesaid Act of February 24th, 1855, legally liable to pay to the State of Delaware a tax semi-annually at the rate of one fourth of one per centum upon the surplus or contingent Fund of said Bank exceeding twenty-five per centum of the said surplus, or contingent Fund, that then judgment shall be rendered by the Court in favor of the said State against the defendants for the sum of            the payment of which to the Treasurer of the State shall be in discharge of said tax for the six months ending on the 1st day of July, A. D. 1857; but if the Court should be of opinion that the defendants are not so liable, that then judgment shall be rendered by the Court for the defendants for costs.

*W. Saulsbury*, for the plaintiff: The original act of incorporation of the Bank of Smyrna with all the supplementary acts since passed in relation to it, so far as they are material to the consideration of the question involved in this case, are contained and set forth in the case stated submitted to the Court. On behalf of the defendant it is alleged and insisted that by virtue of the sixth section of the supplement passed on the 7th day of February, 1822, which provided " that in lieu of other taxes the said President, Directors and Company of the Bank of Smyrna, should pay the Treasurer of the State for the use of the State, a tax semi-annually at the rate

of one fourth of one per centum on the whole capital stock of the said Bank actually paid in, for and during the continuance of the said Bank from and after the first day of September next," this institution is. exempted from the operation of the general act entitled " An Act to tax the surplus or contingent funds of the Banks of the State of Delaware," passed on the 24th day of February, 1855, and from the tax imposed by it. Because, as it is alleged, the exemption " in lieu of all other taxes" under the supplement of February 7th, 1822, was a matter of contract between the State and the corporation, inserted in the charter of the company, by which the latter agreed to pay, and the State agreed to accept, the tax thereby imposed at the rate of one fourth of one per centum semi-annually on the whole capital stock actually paid in during the continuance of the Bank, in lieu of all other taxes, and that it would impair the obligation of this contract and violate the terms of this agreement, to apply the provisions of this later act for taxing the surplus or contingent fund of the Banks of the State generally, to the Bank of Smyrna. But is it exempted from this surplus or contingent fund tax by virtue of the supplement of 1822 ? To establish this, it must be shown that it contains a renunciation by the State, of the right to tax, or a special agreement that the State will not exercise that right with reference to this Bank.

The twenty third section of the original act of incorporation, it will be. observed, provides that it was upon the condition contained in the twentieth section of the same act, the payment of one half of one per centum upon the stock actually paid in, and upon the other conditions in the said act contained, that the charter of incorporation was granted. Such tax was therefore a bonus to be paid annually to the State for the franchise of the bank, that is to say, for the privilege of banking. To that it was confined; beyond that, it could not extend. It was the consideration to be paid. for incorporation, and for that

alone, and it was so expressly declared in the act. It was not a consideration paid, or to be paid, for the exemption of its corporate property, its stock, its real estate, its dividends, its surplus, or contingent fund from taxation. The franchise of a bank is property, taxable property of the bank, not only in this State, but in every State of the Union. 3 *How*. 133. Had the State omitted to tax this bank in the original act of incorporation and in the supplement thereto, it would now be competent for it to impose a tax upon it. Every renewal of its charter operated as a new grant of the franchise, and the amount of the bonus, or tax might have been increased, or diminished by the Legislature. If the case were presented solely in view of the provisions of the act of 1821, I presume it would not be seriously questioned that the tax under that act, was a tax upon the franchise of the bank, and upon its franchise only. Did the act of 1822 change the nature of this tax to a tax upon the property of the bank? It was evident that it did not from the provisions of the latter act and the circumstances under which it was passed. The tax of one fourth of one per cent. was but a substitution for the tax of one half of one per cent contained in the former act. The object and the subject matter of taxation was the same in both acts. If the subject matter of taxation was designed to be different in the two acts, and that it should be more extensive in the latter than in the former, we might reasonably expect to find, that such an intention would clearly appear, and would not be left to conjecture and supposition, or to inference from slight circumstances, or to dubious and uncertain expressions merely. The intention of the Legislature to surrender the power of taxation in any instance, must manifestly appear either from express terms of renunciation, or result from necessary and logical interpretation. Now, what is there in the supplement of 1822 to indicate such an intention? For if it did not appear in that act, it could be discovered in no other. It might be argued on the other side that the repeal of the twentieth section and so much of

the twenty-third section of the original act as related to it and the expression "in lieu of other taxes," would have this effect. But in reply to that suggestion it should be remembered that although the company at that time had been incorporated, the required amount of capital stock had not been subscribed and it had not commenced operations as a banking institution, and it was necessary that its charter should be renewed and extended for that reason. No additional consideration, however, was asked for the franchise, but in ease of and for the benefit of the institution the Legislature saw proper to reduce the tax imposed on the franchise from one half to one fourth of one per centum, and for that purpose declared that the repealing section should constitute a part of the original act of incorporation, and that such sum should be in lieu of other taxes, that is to say, in lieu of the taxes which would have otherwise accrued at the original rate in each and every year thereafter; for there were no other taxes spoken of to which it could have reference. Besides, it would be observed that the words relied on are not in lieu of the right to impose other taxes. It was a settled principal of law that the bonus required in an act of incorporation whether it was a sum in gross, or reserved by way of an annual tax on the stock of the company, it had reference to the franchise granted, and not to the corporate property separable from the franchise, unless it was otherwise declared by the grant, or specially agreed between the parties. But viewed in the light in which the words in question were interpreted on the other side, it would involve not only the surrender of a larger sum for a smaller, but also the surrender of the unquestionable right to tax the corporate property of the bank, and among other things its real estate, which, under the provisions of its charter, it had the right to acquire by mortgage and by purchase at public sale on its own judgments to the amount of its whole capital. Could it be supposed for a moment, that the Legislature by such vague and general expressions, intended to surrender and part with the

power to tax such property as this and to such a value as this might in the progress of time amount to, during the whole existence of the bank? It was impossible that such could have been its intention.

By the act of the 13th of February 1855, the charter of the bank was renewed for twenty years, by the first section of it, and by the second section it was provided that the tax hereafter to be paid by the bank should be one half of one per centum on its capital stock, in lieu of one quarter of one per centum per annum. This act operated as a new charter of the bank. It continued the corporation, but it did not continue the act of incorporation with its supplements. The corporation was continued with all its capacity, powers, privileges and franchises, and these only were renewed, which embraced no exemption from taxation; and to show that such was even the understanding of the bank itself, it had never refused to pay, or objected to any tax imposed in the mean while on its real estate, which had been uniformly taxed and paid without dissent from that time to the present.

The charter of a bank was a franchise which was not taxable as such, but the corporate property of the bank was separable from the franchise and might be taxed, unless there was a special agreement to the contrary. 3 *How.* 133. It was hardly necessary to define the term; but a franchise was, according to the English authorities, a royal privilege, or a branch of the royal prerogative subsisting in the hands of a subject by grant from the king. 3 *Cruise* 278. 2 *Black. Com.* 37. Here it subsisted by grant from the legislature and might be in the hands of one, or more persons, as in a corporate body. The tax of one half of one per cent., mentioned in the act of 1821, of one fourth of one per cent., in that of 1822, and one half of one per cent. in that of 1855, which the bank now paid, was not, and was not designed to be, a tax upon the property of the bank, but it was a bonus or consideration for the franchise, to be paid as a tax on its capital stock, without any relation to its prop-

erty. In the case of the *Providence Bank v. Billings and Putnam,* Chief Justice Marshall remarked that the taxing power of the State was of vital importance, that it was essential to the existence of government, were truths which it could not be necessary to reaffirm. They were acknowledged and assented to by all. It would seem that the relinquishment of such a power was never to be assumed. He would not say that a State might not relinquish it; that a consideration sufficiently valuable to induce a partial release of it might not exist; but as the whole community was interested in retaining it undiminished, that community had a right to insist that its abandonment ought not to be presumed in a case in which the deliberate purpose of the State to abandon it did not appear. 4 *Peters* 514. Again, he remarks on page 562 of the report, that the power of legislation, and consequently of taxation, operated upon all the persons and property belonging to the body politic. This was an original principle which had its foundation in society itself. It was granted by all for the benefit of all. It resided in a government as a part of itself and need not be reserved when property of any description, or the right to use it in any manner, was granted to individuals, or corporate bodies.

We therefore think it quite manifest both on principle and authority of the highest judicial weight and sanction that the act in question was entirely constitutional.

*D. M. Bates,* for the defendant, objected to the validity of the act of 1855, because it impaired the obligation of the contract contained in the sixth section of the supplement to the charter of the Bank passed on the 7th day of February 1822; for that section is a part of the charter of the Bank as extended by the act of the 3d of February 1855—the tax imposed by that section being in lieu of other taxes, the exemption was one of the privileges renewed by the latter act. The first question then which arose was this, did that section continue a part of the existing charter of the Bank? He should contend that

it did.   The mere renewal of an existing corporation of itself, without any thing more, renewed, or extended the corporation with all its existing rights, privileges, immunities, and provisions.   For that was essential to its very existence and identity as a corporation; because a corporation consisted of nothing more than its aggregate powers, privileges and franchises conferred by law upon it.   It was not true, therefore, as had been said on the other side, that a renewal, or continuation of a pre-existing corporation, was the creation, or incorporation of a new company.   It was manifest upon the face of the act of 1855, that it was the intention of the legislature to continue the corporation precisely as it existed before, with the same powers, privileges and franchises, which it had previously enjoyed.   The important word in this connection was *privileges*, which embraced the exemption contained in the sixth section of the supplement of 1822. What was the import of that term ?   According to *Walker's* and *Johnson's* dictionaries, the word *privilege* signified to invest with rights and immunities and to exempt from paying taxes and imposts.   According to *Richardson*, a liberty, or immunity ; a peculiar benefit, or advantage, an exemption, an immunity—an exemption from taxes, an immunity from service ; and according to *Webster* and *Worcester* the import of the word was substantially the same.   All therefore showed it to have application to certain exemptions, rather than to powers, limited to persons of a limited class ; as exemption from arrest, privileges in debate &c.   *Jac. Law Dict. Privilege. Whart. Law Dict. Privilege.   Campbell v. Morris*, 3 *Harr. & McHenry* 553.   *State v. Betts*, 4 *Zabrisk*, 555.   In the latter case a canal Company was authorized by a supplement to its original charter to extend its canal subject to the same rights, powers and .privileges as contained in its original charter.   By the original charter the Company was exempted from taxation and it was held that under the term *privileges*, the exemption extended to the new part, or the extension of the canal.

It was insisted, however, on the other side, that the exemption applied only to the franchise, or privilege of banking, and not to the stock or property of the company; that the tax previously imposed was in the nature of a bonus payable semi-annually, instead of in gross, for this franchise, or privilege, and was not intended as a tax on the wealth or property of the corporation. But he should contend that under the sixth section of the supplement of 1822, the exemption was from all taxation, except the one-fourth of one per cent. on the capital stock, whether imposed upon the capital stock or the franchise of the company. Under the act of 1855, the exemption was only varied by increasing the one-fourth to one-half of one per centum. The terms used were in lieu of other taxes. What were taxes, and what was the sense in which that term was employed by the Courts? It was a generic term and included all kinds of duties, imposts, excises and impositions of every kind and description. *Hylton v. The United States,* 3 *Dallas* 171. 1 *Story on the Const. Sec.* 950. 2 *Bouv. Law Dict.* 550. What then was the force and effect of the words " other taxes," and as the terms were relative in their character, to what other taxes did they necessarily refer? He maintained that they necessarily embraced all other taxes than the one fourth of one per cent. imposed by the sixth section of the act of 1822. The second section of the act of 1855 which substituted one-half in the place of one-fourth of one per cent. repealed nothing except by implication. It took away none of the pre-existing privileges of the Bank, and to hold otherwise, would be a forced construction of the words used, and would violate the intention of the legislature; for it was a legal rule of construction of statutes, that a repeal by implication, was to extend no further than the implication necessarily carried it. In the twentieth section of the act of 1821 the legislature did not use the term *tax* in regard to the reservation of the one-half of one per cent. contained in that section, and therefore when it after-

ward repealed that section in 1822, and substituted the one-fourth of one per cent. in lieu of other taxes, it was to be presumed that it intended something more than the mere reservation of the former rate, which was not termed a tax in that act, since it would have been much more natural, simple and unequivocal, if it intended nothing more, to adopt other words and said in lieu of the one-half of one per cent. reserved by that section.

When the exemption from taxation by the legislature was in general terms, it applied to no particular species or mode of taxation, but embraced every kind of taxation, or imposition, by State, County, or City, whether levied upon the franchise, or property of the company, even to the extent of exempting dividends on stock in the hands of stockholders. *State v. Berry*, 2 *Harris, Rep.* 80. *Camden & Amboy R. R. Co. v. Hillings*, 3 *Harris, Rep.* 11, 3 *Harris, Rep.* 71. *State v. Powers*, 4 *Zabrisk*, 400. *State Bank v. City of Charleston*, 3 *Rich.* 342, 5 *Rich.* 561. *Gordon v. Appl. Tax Court*, 3 *Howard* 133. And the exemption applied to all property owned by the corporation as a corporation, as capital stock, a surplus, or contingent fund, in contra-distinction to other kinds of property owned by it in common with natural persons.

But admitting that this was an exemption from taxation on the franchise alone, what was the tax imposed by the act of 1855 ? Was it a tax upon the franchise, or on the property of the Company ? The franchise to do business as a Bank, was itself a property liable to be taxed, and that might be done either by a tax on the capital stock which it had employed in business, or on the profits of its business, which was itself a franchise, or privilege, or property peculiar to the corporation. And what was this contingent, or surplus fund taxed by the act of 1855 but an accumulation of the profits of the Bank through a long series of years, set aside and preserved in aid of and for the security of the business of the Bank against contingent losses and depreciation of property ? The provision for exemption from taxation contained in the

act of 1822 and renewed and continued by the subsequent acts of renewal, he contended was a contract between the State and the Bank, the obligation of which could not be impaired by the legislature. It was now settled that every charter of incorporation was a compact between the State and the Company, and every corporate right, or privilege conferred was a part of the contract, and could not be changed, or diminished without the consent of the Company. *State Bank of Ohio v. Knoop*, 21 *Curtis* 194. In that case the exemption was in the following words; " shall be in lieu of all other taxes to which the Bank would otherwise be subject, " and the act in question imposed a tax on the surplus and contingent fund of the Bank, which was held to be unconstitutional, as impairing the obligation of the contract contained in the exemption.

It was unquestionably competent for the legislature of 1822 in creating a corporation, to stipulate for the tax it should pay during its existence, and to exempt it from all other taxation for a proper equivalent. For it was in the power of one legislature *bona fide* and for a proper equivalent to exempt any species of property from taxation, so as to bind a subsequent legislature, when it assumed the nature and character of a contract between the State and the parties exempted. This had been ruled by the Supreme Court of the United States and was now well settled. *N. Jersey v. Wilson*, 7 *Cranch* 164, 2 *Curt.* 498. *Gordon v. Appl. Tax Court*, 3 *How.* 133. *Osborne v. Humphrey*, 7 *Cranch* 335. *Johnson v. Commonwealth*, 7 *Dana*, 338. *State v. Brannin*, 3 *Zabr*. 485. *Herrick v. Randolph*, 13 *Vermont* 525. *Mayor of Balt. v. Balt. & Ohio R. R. Co.*, 6 *Gill* 288. *State Bank of Illinois v. People*, 4 *Scam.* 303. *Dodge v. Woolsey*, 18 *How.* 330. *State v. Allmond, Del. Rep. by Houston J.*

*Smithers*, for the defendant: After the long and able argument of his colleague, it was almost unnecessary for him to add anything in the case, and he should, therefore,

15

be brief in what he had to say in regard to it. There were only two questions which he should consider; first, was there a contract between the State and the Bank in relation to the matter in question; and, secondly, if there was a contract, had it been impaired by the act of the legislature of 1855? That there was a contract between the State and the Bank in this case, was sustained by the decision of the Court in the cases of *Mathenny et al. v. Holden*, 5 *Ohio* 361. *Ohio Life Ins. & Trust Co. v. De Bolt*, 16 *How.* 450. *West River Bridge Co. v. Dix*, 6 *How.* 542. *State of Ohio v. Morgan*, 5 *Ohio* 445. Did the acts of the legislature all taken together, constitute a contract of exemption either express, or implied? Every valuable privilege conferred by the charter and induced its acceptance by the Company, was a contract between it and the State. *State Bank of Ohio v. Knoop*, 16 *How.* 388. The second section of the act for the renewal of the charter in 1855, was as follows: " The tax hereafter to be paid by the said Bank, shall be one half instead of one fourth of one per cent. per annum; *provided*, that no tax shall be required on any stock held for the benefit of the School Fund." That was a tax on the whole corporation— on all its franchises and property, graduated, he admitted, but nothing more, according to the capital stock of the Company, as the basis of value, or assessment on which the tax was imposed upon the corporation. Now, what exemption was this, and what was the value of it, if the franchises and privileges of the Bank could still be taxed by the legislature *ad libitum*? He did not conceive it necessary to dwell upon the question, but should submit it with these few remarks and the argument of his colleague, to the consideration of the Court.

*Fisher, Attorney General*, for the State: The right of taxation was an essential attribute of sovereignty, and although the General Assembly was clothed with the legislative power of the government, it could not delegate,

or sell this attribute of sovereignty, because it was not a legitimate subject of contract, or alienation. *Rice v. Foster*, 4 *Harr.* 485. But if the act of 1822 constituted, or comprised a contract valid and binding on the State, still it only exempted the banking franchise of the Company from taxation, and not the real estate, or other property of it, there being no special, or express terms to that effect in the act, and without which no such exemption could be presumed, or sustained. *State Bank of Ohio v. Knoop,* 16 *How.* 338, 21 *Curt.* 201. *Louisv. & Portl. Canal Co. v. The Commonwealth,* 7 *B. Monroe Rep.* 161. *Commonwealth v. The Easton Bank,* 10 *Barr.* 449. The difference between these and the precedents cited on the other side, was based on the principle and distinction which he had just stated, for the latter were all cases of express exemption from taxation in specific terms. And he further insisted that if the act of 1822 would bear such a construction as to expressly exempt the property of the Bank from all other taxes, future as well as those previously imposed, still the act of renewal of the charter in 1855, contained no such exemption either in express terms, or by implication. The proviso contained in the second section of the latter act, showed that the tax imposed by that section was on the capital stock of the Company, because the terms of the proviso were " that no tax shall be required *on any stock held* for the benefit of the school fund."

*Harrington, Chancellor,* delivered the opinion of the Court : This case involves the question of the constitutionality of an act of the legislature of 1855, taxing the surplus earnings of the Banks ; the Bank of Smyrna contending that by its charter it is exempt from taxation, otherwise than to the amount of one fourth of one per cent. of its capital. Some of the Banks having accumulated a large surplus fund, the legislature thought proper to impose a tax on these surplus funds, as a part of their

banking capital, which the Bank of Smyrna resists under a claim of exemption, and a case was agreed upon to settle the question, which involves several fundamental questions touching the powers of the legislature to impose additional taxes on corporations; the power of one legislature to bind subsequent legislatures not to impose further taxes; the immunities of corporations generally, and the particular exemptions of this Company under the terms of its charter.

The Bank of Smyrna was incorporated on the condition of paying a tax of one half of one per cent. on its capital. The other Banks of the State at that day paid but one fourth of one per cent.; and because, probably, of this discrimination, the amount of stock required to be subscribed for its organization, was not taken. At the next session, the legislature repealed the tax of one half of one per cent., and enacted that "in lieu of other taxes," the Bank should pay one fourth of one per cent. on its capital; and with this change the Bank went into operation. It was several times renewed, and it continued to do business without further taxation until 1855, when in the act renewing its charter, the legislature imposed a tax of one half of one per cent. The Bank submitted to this; but by a subsequent general law, all the Banks were required to pay tax also on seventy-five per cent. of their surplus earnings, which was the tax now objected to by the defendants.

Since the decision of the Supreme Court of the United States in the case of *The Bank of Ohio v. Knoop*, 16 *How.* 369, 21 *Curtis* 190, and the many cases which have succeeded it, the question cannot be considered open for argument, whether the legislature can bind the State by contract with a corporation created by its charter, not to tax for a given time, the franchise, or property of such corporation further than is agreed on in the charter. It was long before that case, settled that such a charter was a contract between the State and the corporators, which was protected by the constitution of the United States,

and was inviolable. And it is now settled that an agreement to limit or restrain the power of the State to impose further taxes on the franchise of a corporation during the continuance of its charter, may enter into such a contract and have binding force. The argument that the power of taxation, being an essential attribute of State sovereignty, cannot be limited by the legislature, has been fully considered and refuted by the Supreme Court of the United States ; and the theory revived again in this case, which supposes there are restrictions on legislative power not to be found in the constitution, but existing above it and to be enforced by the courts, is also exploded. Every power of government may be said to be a sovereign power ; most of them are essential to its sovereignty ; all of them are liable to be abused ; yet it cannot be said that because they may be abused, they shall not be used ; and the proper use of many of them requires prospective arrangement that shall not be liable or subject to change at each succeeding legislature. The power to make contracts is equally a sovereign attribute with the power to tax ; and yet a contract which is to be subject to change or annulment by one of the parties at pleasure, is no contract ; and unless the State can restrain its own power so to change its will in this respect, the power of making contracts essential to sovereignty, is destroyed. The exemption of property from taxation is a question of policy, and not of power. Such an exemption would generally be impolitic, and should not be granted except for great public objects ; but the legislature is the proper judge of this. It selects the subjects of taxation and arranges the basis and the amount of taxes. Practically, it is always exempting some species of property or other from taxation, or preferring one mode of raising revenue by taxation to another, as policy dictates; and if such policy in the judgment of the sovereign taxing power dictates the entire exemption of any species of property from taxation for a given time, it is the proper exercise of such power so to exempt it ; and as the State has the

power also to make contracts, it is the proper exercise, and not the relinquishment of the power of taxation, to stipulate for exemption in a given case and on a sufficient consideration. Such a contract for exemption, however, will not be implied; though it will be enforced when clearly expressed. It will not be presumed that the State has lightly parted with the power of taxation. The State may own and sell in fee simple an estate in land. While so owned it would not be taxed. When sold, though for its full value, it would be subject to tax as other property of the same kind; and the purchaser could not claim that because he bought of the State at its full value, it was exempt as before from taxation; but if in the contract of sale the legislature should think fit to agree that it should for a limited time be exempted from taxation, it would be perfectly competent for it to make such a contract which would then be under the protection of the federal constitution.

Corporations are the creatures of the legislatures, created for public and useful objects, and are often the only means of effecting these objects. Their character and extent, their powers and immunities, as well as their duties and obligations, are just such as the legislature pleases to make them; but when made, like natural persons they are capable of making contracts even with the power that creates them, or with subsequent legislatures, and their contracts when made are under the same protection as other contracts. Their property in the case of Banking corporations, is their franchise, or right to do banking business within the limits of their charter ; their capital invested in such business, their surplus earnings set apart undivided and such other property, real and personal, as they may be authorized to have. All this is liable to taxation just as the property of individuals is liable to taxation, unless otherwise agreed upon in their charters. They may trust, as all others on acquiring property trust, that the legislature will not tax them beyond certain limits; but this imposes no obligation on

the legislature. It is a mere calculation of chances, or reliance on public justice, or policy, and affords no legal immunity beyond what is expressly stipulated in the charter. The bonus is the price paid for the franchise—the power to do banking business. Whether measured by tax on capital stock, or by a specific sum stipulated, it is the price paid for doing business as a bank; and unless otherwise stipulated and agreed upon, it no more exempts other property, such as the surplus accumulation of earnings derived from that business while in its hands undivided, than it does the dividends in the hands of the stockholders, or the banking house, or any other real property which it holds. These views are fully sustained by the Supreme Court in *Gordon v. The appeal Tax Court*, 3 *How.* 133, 15 *Curtis* 388. In that case the Court says "The franchise is their corporate property which like any other property would be taxable if a price had not been paid for it, which the legislature accepted as the consideration for allowing them to use the franchise during the continuance of their charters. The capital stock is another property, corporately associated for the purpose of banking; but its parts is the individual property of the stockholder in the proportions they may own them. Being their individual property they may be taxed for it, as they may be for any other property they may own."

We have then only to look at the several laws constituting the charter of the Bank of Smyrna, to see if the legislature has by contract exempted its surplus earnings from the common liability of all other property to taxation, having ascertained that it was competent for the legislature by contract binding on subsequent legislatures, to exempt this, or any other part of its property from taxation. It was incorporated in 1821 for twenty years, and by the 18th section of its charter it was provided that if the sum of $75,000 should not be subscribed for in its capital stock by the 1st of September 1822, the charter should cease and be of no effect; and by the 20th section it was enacted "That as a condition of the passing of this

act" the company should pay to the State Treasurer semi-annually for the use .of the State "at the rate of one half of one per centum per annum on the stock actually paid in for and during the continuance of the present charter." But before the organization of the company pursuant to this provision of the charter, a supplement to it was passed by the legislature on the 7th of February 1822, continuing its corporate powers until 1843, repealing the 20th section of the original charter and enacting "that in lieu of other taxes, the said President, Directors and Company of the Bank of Smyrna shall pay the treasurer of the State for the use of the State, a tax semi-annually at the rate of one fourth of one per centum on the whole capital stock of the said Bank actually paid in for and during the continuance of the said Bank from and after the 1st day of September next." In 1837 the corporation was extended to February 1857 with "all its rights, powers, privileges, franchises and immunities vested in it by any law of the State;" and on the 13th of February 1855, the charter was again renewed and extended for twenty years. But it is to be remarked that in this last act of renewal, the act of 1822 which contains the expression relied on in the argument of the counsel for the defendants, as conferring an immunity from further, or future taxation, "in lieu of other taxes," is not referred to, nor are the words "rights and immunities" occuring in the renewal and extension of the charter in 1837, contained in this act; the second section of which provides that "The tax to be hereafter paid by the said Bank shall be one half instead of one quarter of one per centum per annum; Provided that no tax shall be required on any stock held for the benefit of the School Fund."

The question therefore is whether under this act of the 13th of February 1855 which now constitutes its charter, incorporating as it does, all the previous acts to the extent to which it proposes to incorporate them, the Bank of Smyrna has any right, or immunity to be exempt from any other taxation than that imposed by the act of 1822,

which was one fourth of one per cent. on its capital stock ? The powers of the company are derived, exclusively, from the act of extension.  That act might adopt by reference, the language of any other, but the exemption must be expressed at the time of renewal.  In the case before referred to in 3 *Howard* 133, it is said the exemption lasts only during the continuance of the charter and when extended without any such promise, the power to tax revived.  In that case the exemption was in the most formal terms, as follows : "and the faith of the State is hereby pledged not to impose any further tax, or burden upon them during the continuance of their charters under this act," yet these words being omitted in the act of extension, it was held that they were after that liable to further taxation.  And this is peculiarly the case in our State, since by constitutional limitation these charters are restricted in the grant and duration of them, to a period not exceeding twenty years, and the power of the legistature to confer such immunity, must have the same limit. The exemption in question must therefore be shown to exist by the express grant of the legislature in the act of 1855.  But, as we have before remarked, the legislature in that act of renewal, not only omitted to extend the *rights* and *immunities* granted in the previous act, but wholly omitted to notice the particular act under which the exemption is now claimed.  It extends only the "powers, privileges and franchises" belonging to, or vested in the Bank created by the act of 1821 and renewed and continued by the act of 1837; whilst this assumed immunity is by force of a supplement passed in 1822.

The court might properly rest its judgment on the failure to repeat in the last renewal of the charter a supposed pledge given in a former act which by its own limitation, as well as by constitutional necessity, has expired ; but the words "in lieu of other taxes" used in the act of 1822, are an insufficient foundation for the surrender of the taxing power. They are capable of explanation otherwise and without any forced construction of the act. The

16

previous act of 1821 imposed, though not by the name of tax, as a condition for the grant of the Banking franchise, an obligation to pay the State one half of one per cent. on the capital paid in ; the act of 1822 repealed this, and added that in lieu of other taxes the Bank should pay one fourth of one per cent. on its capital.   The one half per cent. is the thing in the law repealed, in whose place was substituted by the law repealing it, the one fourth of one per cent. in lieu thereof; and it would be rather a strained inference to draw a solemn agreement by the State not thereafter to impose any other tax on this, or any other property of the Bank.   For the act of the 24th of February 1855 taxing the surplus fund of all the Banks, is not a tax upon their stock; and the objection to it goes to the full extent of denying the power to tax any property of the Bank other than its stock, and might as well extend to its real property as to its surplus fund. ₒ On the contrary, the tax upon stock which would come within the exemption, if there was an exemption, was imposed, not by the act of the 24th of February 1855, which is now objected to, but by the act of the 13th of February 1855, which is not objected to; and that too, notwithstanding the renewed charter of 1837 was not to expire until 1857, two years after the latter act was passed.   The latter act was therefore more clearly a violation of the contract of 1822, if there was such a contract not to lay any other tax on the capital stock of the Bank, than is the former act now under consideration, for imposing a tax on a distinct species of property, its surplus dividends.

The Court is therefore of opinion that the act of February 24th 1855, entitled "an act to tax the surplus, or contingent fund of the Banks of the State of Delaware "is, as to the Bank of Smyrna, a constitutional law, and that the defendants are liable by virtue of that act to pay to the State semi-annually, a tax at the rate of one fourth of one per centum per annum upon the surplus, or contingent fund of said Bank exceeding twenty-five per cent. of said fund ; and it is ordered that this opinion be certified to the Superior Court in and for Kent County.